No. 14-1326

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

RELIABLE CONTRACTING GROUP, LLC,

*Appellant*,

*v.*

DEPARTMENT OF VETERANS AFFAIRS,

*Appellee.*

Appeal from the Civilian Board of Contract Appeals No. 3048

CORRECTED BRIEF OF APPELLANT

William E. Dorris                    Richard D. Dietz
Reginald A. Williamson               Thurston H. Webb
KILPATRICK TOWNSEND &                KILPATRICK TOWNSEND &
  STOCKTON LLP                         STOCKTON LLP
1100 Peachtree Street, Suite 2800    1001 West Fourth Street
Atlanta, GA 30309-4530               Winston-Salem, NC  27101
(404) 815-6500                       (336) 607-7300

*Counsel for Appellant*

## <u>CERTIFICATE OF INTEREST</u>

In accordance with Fed. Cir. Rule 28(a)(1), counsel for Appellant Reliable

Contracting Group, LLC certifies the following:

**1.      The full name of every party or amicus represented by me is:**

Reliable Contracting Group LLC

**2.      The name of the real party in interest represented by me is:**

Reliable Contracting Group LLC

**3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

None

**4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:**

KILPATRICK TOWNSEND & STOCKTON LLP
William E. Dorris
Richard D. Dietz
Reginald A. Williamson
Thurston H. Webb

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................1

JURISDICTION.........................................................................2

STATEMENT OF THE ISSUES......................................................2

STATEMENT OF THE CASE........................................................3

I.  THE CONTRACT ...............................................................3

II.  FISK PROCURES THE CUMMINS GENERATORS ...................4

III.  THE DELIVERY AND VA'S REJECTION OF THE CUMMINS GENERATORS.................................................................5

IV.  INVESTIGATION INTO THE CUMMINS GENERATORS .......8

V.  REMOVAL OF THE CUMMINS GENERATORS AND THE VA'S REFUSAL TO WITNESS GENERATOR TESTS ............9

VI.  PROCURING REPLACEMENT CATERPILLAR GENERATORS.................................................................11

VII.  THE PROCEEDINGS BELOW .........................................13

SUMMARY OF THE ARGUMENT ...............................................15

ARGUMENT .........................................................................16

I.  THE BOARD ERRED AS A MATTER OF LAW IN DETERMINING THAT THE CUMMINS GENERATORS WERE NOT "NEW" UNDER THE CONTRACT......................17

    A.  The Unused Cummins Generators Satisfied the Contract's Requirements...................................................17

    B.  Trade Practice and Custom Confirms the Cummins Generators Were "New" Where They Were Not "Used."..................20

C.  The Factory-Testing Specification Is Irrelevant in Determining Whether the Generators Are New or Used. ...................21

    1.  The Board Misinterpreted the Relevance of the Factory-Testing Specification in Determining Whether the Cummins Generators Are "New" Under the Contract. ...............................................................22

    2.  There is No Evidence to Support the Board's Findings Regarding the Factory-Testing Requirements. .........................24

    3.  The Testing History of the Caterpillar Generators Undermines the Board's Conclusions Regarding Factory-Testing Requirements.................................................26

D.  Reliable Is Entitled to a Recovery for the VA's Economic Waste. ...........................................................................28

    1.  The VA Caused Reliable to Incur Economic Waste. ...............28

    2.  Reliable Is Entitled to a Recovery for Its Economic Waste.........................................................................31

E.  The Board Erred, As a Matter of Law, By Concluding Reliable Failed to Comply with Whatever Certification Requirements the Contract Imposed Upon It.......................................33

F.  Reliable Is Entitled to Its Claimed Quantum Where the VA Failed to Challenge its Damages Below. ............................................37

CONCLUSION ......................................................................38

ADDENDUM

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ajax Petroleum Prods. Co. v. Blake*,
 126 N.E.2d 926 (Ohio Ct. App. 1953)...................................................20

*Alcan Elec. & Eng'g Co., Inc. v. United States*,
 24 Cl. Ct. 704 (1992) ..........................................................................35

*Granite Construction. Co. v. United States*,
 962 F.2d 998 (Fed. Cir. 1992)........................................ 28, 29, 30, 31

*Groban v. S. S. Pegu*,
 331 F. Supp. 883 (D.C.N.Y. 1971) ......................................................20

*Lisbon Contractors, Inc. v. United States*,
 828 F.2d 759 (Fed. Cir. 1987)..............................................................37

*Mathis Equip. Co. v. Rosson*,
 386 S.W.2d 854 (Tex. Civ. App. 1964) ...............................................21

*Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*,
 169 F.3d 747 (Fed. Cir. 1999)..............................................................20

*Rockies Express Pipeline LLC v. Salazar*,
 730 F.3d 1330 (Fed. Cir. 2013)............................................................16

*United States v. Gen. Elec. Corp.*,
 727 F.2d 1567 (Fed. Cir. 1984)............................................................36

## Rules and Regulations

48 C.F.R. § 52.21105 ...............................................................................18

48 C.F.R. § 52.211-5.......................................................................... 4, 18

48 C.F.R. § 52.236-5................................................................................17

48 C.F.R. § 6101.19(2012) ......................................................................14

Fed. Cir. R. 28(a)(1)................................................................................. ii

Fed. Cir. R. 28(a)(4)............................................................................... viii

Fed. Cir. R. 47.5 .................................................................................... viii

Fed. R. App. P. 32(a)(5)..........................................................................40

Fed. R. App. P. 32(a)(6)..........................................................................40

Fed. R. App. P. 32(a)(7)(B)(iii) ................................................................40

**Statutes**

41 U.S.C. § 7101(2)(B)...........................................................................2

41 U.S.C. § 7107(a)(1)(A) ......................................................................2

**Administrative Opinions**

*Appeal of Ben M. White Co.,*
   ASBCA No. 36643, 90-1 BCA ¶ 22420...........................................24

*Appeal of G.L. Cory, Inc.,*
   No. 22811, 79-2 BCA ¶ 13909 .........................................................32

*Appeal of Ite, Inc.,*
   NASA BCA No. 1086-6, 88-1 BCA ¶ 20269.....................................31

*Appeal of Reliable Contracting Grp., LLC,*
   CBCA 1539, 11-2 BCA ¶ 34882 .......................................................37

*Appeal of Whitesell-Green, Inc.,*
   ASBCA No. 24395, 80-1 BCA ¶ 14430.............................................32

*Metric Constructors, Inc.,*
   ASBCA No. 50843, 98-2 BCA ¶ 30,088............................................36

## STATEMENT REGARDING ORAL ARGUMENT

Reliable Contracting Group LLC respectfully submits that oral argument would aid the Court in deciding this appeal. The Civilian Board of Contract Appeals' departure from the plain language of the contract in this case raises serious issues concerning the applicability and enforceability of government contract terms. This issue is thus one of significant importance to this Court's jurisprudence.

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules 28(a)(4) and 47.5, Reliable states that there are (a) no other appeals in or from the same proceeding before the Board that were previously before the Federal Circuit; and (b) no other cases known to counsel to be pending in the Federal Circuit or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## **INTRODUCTION**

In 2003, Reliable entered into a contract with the VA to provide three electrical generators as part of a project to construct a new VA Medical Center in Miami, Florida.  Reliable ended up purchasing three previously owned but unused and fully warrantable generators to deliver to the VA.

The VA refused to accept these unused and fully warrantable generators.  It claimed it could not accept previously owned generators, despite the fact that these generators satisfied the contract's definition of "new," the only requirement imposed on the generator's condition.  The VA's refusal forced Reliable to purchase three other generators and deliver these different generators to the VA.

Despite the fact that the original generators complied with all aspects of the relevant contract and the VA did not dispute the proof of quantum submitted by Reliable, the Contracting Officer nonetheless denied Reliable's certified claim to recover the extra cost imposed upon it by the VA's refusal to comply with the contract.  The Civilian Board of Contract Appeals then affirmed this denial.

Reliable now seeks this Court's review in an effort to ensure that the terms of the contract it entered with the VA are fully enforceable, and to recover the extensive costs it was forced to bear through the VA's refusal to accept the original generators.

## JURISDICTION

The Federal Circuit has jurisdiction over this appeal pursuant to 41 U.S.C. § 7107(a)(1)(A).[1] The Civilian Board of Contract Appeals issued a final and appealable decision on November 17, 2013, in Appeal No. 3048, and this appeal was docketed on March 4, 2014, within 120 days of the date Reliable received a copy of the decision.

## STATEMENT OF THE ISSUES

1.      Whether the Board erred as a matter of law by determining that unused and fully warrantable generators were not "new" under the Contract?

2.      Whether the Board erred as a matter of law by interpreting the Contract to require that the generators could only be "new" under the Contract if they were capable of being tested at the factory?

3.      Whether the Board erred in finding that the generators could not be factory tested where uncontroverted record evidence shows the generators could be factory tested?

4.      Whether the Board erred in failing to find that Reliable is entitled to recover the economic waste it suffered through the VA's failure to provide Reliable an opportunity to cure?

---

[1] The term "Agency board" in § 7107(a)(1)(A) is defined to include the Civilian Board of Contract Appeals. *See* 41 U.S.C. § 7101(2)(B).

5.      Whether the Board erred in holding that Reliable failed to certify the generators by not using the specific word "new"?

6.      Whether Reliable is entitled to damages where the VA failed to challenge Reliable's proof of quantum?

## STATEMENT OF THE CASE

This is an appeal from the November 27, 2013 decision by the Civilian Board of Contract Appeals ("Board") in Appeal No. 3048, which denied a certified claim by Reliable requesting an equitable adjustment to a VA contract for the costs incurred when the VA rejected certain electrical generators as not being "new" under the contract.

## I.      THE CONTRACT

This dispute arises out of a contract (the "Contract") issued by the VA for a project involving the design and construction of a new utility plant and electrical distribution system at the VA Medical Center ("VAMC") in Miami, Florida (the "Project").  (JA002; JA017.)  On February 10, 2003, the VA awarded the Contract to Echo Construction Company for $20,345,000.  (JA002; JA017-19.)  Echo, Reliable, and the VA then entered into a novation agreement that transferred all rights, titles, and interests in the Contract to Reliable.  (JA002.)

A primary purpose of the Project was to upgrade and consolidate electrical equipment at the VAMC.  (*Id.*)  This included furnishing and installing two

emergency electrical generation systems: one to handle essential loads and another to handle back-up equipment and normal loads. (*Id.*) For the back-up systems, the Contract required three electrical generators rated at no less than 1825 kilowatt (kW) prime (the "Back-up Generators"). (*Id.*) This appeal involves only the Back-up Generators. (*Id.*)

The Contract also required that "all equipment, material, and articles incorporated into the work covered by this contract shall be <u>new</u> and of the utmost suitable grade for the purpose intended, unless otherwise specifically provided in this contract." (JA079 (emphasis added).) Through reference to and incorporation of 48 C.F.R. § 52.211-5 (August 2000), "new" is defined under the Contract as "composed of previously unused components . . .; provided that the supplies meet contract requirements, including but not limited to, performance, reliability, and life expectancy." (JA098.)

## II. FISK PROCURES THE CUMMINS GENERATORS

Reliable subcontracted with Fisk Electric Company to provide the Back-up Generators. (JA002.) Fisk then utilized DTE Energy Technologies Inc. ("DTE Energy") to supply the Back-Up Generators. (*Id.*)

DTE Energy offered Fisk three 1825 kW emergency generators manufactured by Cummins Power Generation for installation on the Project: serial numbers F000116717, F000116718 and E000107713 (together, the "Cummins

Generators"). (*Id.*) Generators F000116717 and F000116718 were manufactured in July 2000 and Generator E000107713 was manufactured in June 2000. (JA228.) When DTE Energy offered Fisk the Cummins Generators in 2004, these Generations were all unused.

While unused, the Cummins Generators were previously purchased and delivered to another company; however, that company neither installed nor started the Generators. Rather, the Generators merely sat unused. (JA004; JA113-14.) The Generators were then moved to another company, where they continued to sit unused until they were purchased by DTE Energy to deliver to Fisk. (*Id.*) During the time the Generators sat unused, Cummins Power performed preventative maintenance on the Generators, which showed that they had only run for a few test hours. (*Id.*)

## III. THE DELIVERY AND VA'S REJECTION OF THE CUMMINS GENERATORS

One of the Cummins Generators was delivered to the Project and set into place on June 26, 2004, and another on June 27, 2004. (JA002.) At the time they were delivered to the VA, these two Cummins Generators showed run times consistent with only factory testing and pre-startup activities, which was considered typical of new generators. (JA005-6.) The third Generator did not arrive before the VA's decision to reject the Generators as described below. (JA002.)

Upon delivery to the Project, the VA inspected the Generators. Even though the Generators were unused, Leonard Romano, a VA senior resident engineer, was concerned regarding certain cosmetic problems visible on the Generators. On June 27, 2004, Mr. Romano issued Request for Information Number 177 ("RFI 177") regarding the Cummins Generators:

> Upon receipt of two of the three 1825 kw generators, I am concerned they are not "new" as required by General Conditions 01001, 1.47(a). They show a lot of wear and tear including field burns to enlarge mounting holes. Are they new and will you certify them as such? I cannot pay you for these as planned in this month's payment without that certification.

(JA002; JA101.)

Fisk then wrote DTE Energy on June 28, 2004, about its "serious concerns" regarding the two Cummins Generators delivered to the project site. (JA003; JA102.) Fisk's foreman noted the "BAD CONDITION" of the Cummins Generators. (*Id.*) Fisk also noted to DTE Energy that Reliable and the VA had indicated that the two Cummins Generators "appear to be used" and were to be removed. (*Id.*) Fisk requested documentation from DTE Energy that the Cummins Generators were new. (*Id.*)

Reliable also sent Fisk a written correspondence that same day. Because of the comments it received from the VA, Reliable was concerned that the Generators were not suitable. Reliable noted that the Generators "were manufactured four years ago" and, due to markings on them, Reliable had "concerns that the

[Generators] have been previously installed and used." (JA003; JA007.) The Reliable correspondence also noted that the Cummins Generators must comply with the Contract.

On June 28, 2004, DSA Encore—which had sold the Cummins Generators to DTE Energy—wrote to DTE Energy and explained that the three Cummins Generators were "new, unused units." (JA003; JA114.) DSA Encore also explained that although the Cummins Generators were previously sold to another company, they were neither installed nor ever started; instead, the Cummins Generators merely sat in place unused. (JA004; JA114.) DSA Encore further explained that it hired Cummins Power to perform preventative maintenance, start the Generators and prepare them for storage. (*Id*.) DSA Encore ensured that the Generators only had a few test hours of use and came with a full 1-year warranty. (*Id*.) DTE Energy then forwarded this explanation to Fisk.

On June 29, 2004, Mr. Romano wrote Reliable to reiterate the VA's position regarding the Cummins Generators: "be advised that the Government will not accept *used* equipment . . . Only two of the three [generators] ever showed up and they are not only used but also abused." (JA004; JA110.) Mr. Romano requested "a full explanation," which Reliable and Fisk set out to provide. (JA004-5; JA110.)

## IV.   INVESTIGATION INTO THE CUMMINS GENERATORS

Reliable wrote to Fisk on June 29, 2004, advising that Reliable was taking the matter very seriously and "as we discussed with you, the equipment on site is clearly unacceptable by anyone's standards." (JA005; JA106.)  Reliable urged Fisk to have conforming equipment delivered to the Project as soon as possible due to the "critical nature of [the Generators] to the schedule and overall success of the project," and asked Fisk to remove the Cummins Generators and resolve the issue so as not to impact the schedule. (*Id.*)  Reliable conveyed this message to Mr. Romano. (JA005.)

Fisk continued to actively investigate the issue and provide evidence sufficient to demonstrate that the Cummins Generators conformed to the Contract requirements.  Through this investigation, Fisk confirmed that these Cummins Generators were, in fact, unused and conformed to the Contract's requirements.  On June 29, 2004, Fisk had a representative from Cummins physically view the Cummins Generators and witness their history from their control panels. (JA005; JA107.)  The Cummins representative informed Fisk that information from Cummins confirmed that the Cummins Generators were in good condition and still new generators. (*Id.*)  Indeed, one Generator showed only 7 start hours, 3 engine hours and 9 control hours, while the other Generator showed 12 start hours, 2 engine hours and 4 control hours. (*Id.*)

Fisk then summarized the findings for Reliable, stating "[t]he readings indicate that the generators appear to only have been in test and start-up condition. At this time we are waiting for the documentation from the manufacturers indicating a complete history and a definitive plan of action from DTE to remedy the condition of the generators in place." (JA005; JA108.)

A day later, on June 30, 2004, Fisk wrote Reliable to inform it that a Cummins representative had gained access to the generator control panels via a laptop computer and "the control panel readings indicated both generators had only factory startup and test run times." (JA005; JA115.) Fisk concluded, "[i]n that the generators appear to have been inadequately stored"—as opposed to being used— "we have directed DTE Energy to provide us with their plan of action for removing the generators from the project and for providing the generators in compliance to the purchase order." (*Id.*) Fisk also told Reliable it would continue to search the market for replacement generators in the event this issue could not be resolved. (*Id.*)

## V. REMOVAL OF THE CUMMINS GENERATORS AND THE VA'S REFUSAL TO WITNESS GENERATOR TESTS

On or around July 1, 2004, Reliable told Fisk to have the Cummins Generators removed from the VA project. (JA006.) The Cummins Generators were removed that day and shipped to OK Generators, which had factory certified technicians capable of testing and servicing the Cummins Generators. (*Id.*) OK

Generators then tested the Cummins Generators at its facility. (*Id.*) Although invited, the VA chose not to observe the testing. (*Id.*)

DTE Energy provided Fisk with a letter proposal around July 8, 2004, to address any remaining issues with the Cummins Generators. (JA006; JA120.) In the letter proposal, DTE Energy verified that the Cummins Generators at issue "are unused and warrantable" and were "fully backed by the standard DTE Energy Technology warranty and the underlying Cummins One 1 year warranty for new engines." [2] (*Id*.) DTE Energy also verified the work performed by a Cummins representative, who previously ran the generator status report:

> In accordance with your request, a representative from the local Cummins authorized service group went to the jobsite, powered the units, and took readings of the runs hours on two of the three units; they were 2 hours and 3 hours. These runtimes represent factory test and pre-startup activities and are typical of new units.

(*Id*.)

Based on these verifications, DTE Energy proposed to test and evaluate the Cummins Generators, adjust them as necessary, perform pre-conditioning activities, and then return the Generators to the VA on July 19, 2004. The proposed pre-conditioning activities included: "evaluation; cleaning, removing

---

[2] Specifically, Cummins Generator F000116717 was commissioned, and its manufacturer's one year warranty commenced, in March 2005. (JA228 (Birdsong Aff. at ¶ 1).) Cummins Generator F000116718 was commissioned, and its one year manufacturer's warranty commenced, in February 2006. (*Id*.) This information is unknown for Cummins Generator E000107713. (*Id*.)

rust, and painting the exterior surfaces; changing the oil and filters; replacing the coolant; and cleaning, removing rust, and painting the mufflers." (*Id.*) Fisk forwarded the DTE Energy proposal to Reliable on July 9, 2004, which emailed it to Mr. Romano that same date.

On July 15, 2004, Mr. Romano rejected DTE Energy's proposal based solely on the contention that the Cummins Generators were previously owned and "*[p]revious ownership makes them used*." (JA006; JA122 (emphasis added).)

## VI.  PROCURING REPLACEMENT CATERPILLAR GENERATORS

Fisk asked DTE Energy for submittals on the Cummins Generators, but also set about procuring replacement generators. (JA007.) Fisk procured three Caterpillar Generators from Pantropic Power, Inc. (JA007; JA136-37; JA123-27; JA241 (Muhl Aff. ¶ 91).) The Caterpillar Generators were provided through a joint venture of Pantropic and High Plains Power Systems, Inc. ("High Plains"), the local Caterpillar dealer in Omaha, Nebraska. (JA008; JA136-37; JA241 (Muhl Aff. ¶ 92).)

Just like the Cummins Generators, the Caterpillar Generators were previously owned and were mounted in outdoor enclosures. Both the Cummins and Caterpillar Generators were originally in enclosures that allowed them to be located outside. In both instances the enclosures were removed, which caused some cosmetic metal discoloration. (JA231-33; JA237.)

The Caterpillar Generators were originally built for High Plains, kept in stock by High Plains, and ordered from High Plains by a buyer in Tampa, Florida, before that order was canceled. (JA136-37; JA241 (Muhl Aff. ¶ 91).) In fact, the Caterpillar Generators actually had parts stamped "Tampa" before the Tampa buyer canceled the order. (JA237 (Muhl Aff. ¶¶ 60-61).) Because the original order by the Tampa buyer was canceled, Fisk purchased the Caterpillar Generators before they were put into use. (*Id.*) The generators were ultimately shipped out to the Project in Miami, with stops in South Dakota and at Pantropic along the way. (JA241 (Muhl Aff. ¶ 90-92).)

The Caterpillar Generators did not experience load testing at the Caterpillar factory; however, undergoing load tests offsite is not uncommon in the industry. (JA137; JA239-40 (Muhl Aff. ¶¶ 72, 73, 82) ("Regarding the resistive load bank tests, this is in fact a VA requirement and can be performed on units in any number of places. Resistive load bank tests can be performed at the factory, at a local dealer, or even at the job site.").) The Caterpillar Generators were load tested at the VA job site. Reliable's submittal on the Caterpillar Generators was then approved on October 13, 2004. (JA007.) On April 19, 2005, Reliable provided to SRE Romano certifications from Pantropic and High Plains that the Caterpillar Generators were "new." (JA135-37.)

Reliable submitted detailed, extensive and uncontested proof of quantum to the VA. (JA220-27; JA241-46 (Muhl. Aff. ¶¶ 94-123); JA273-74 (Conkin Aff. ¶¶ 19-25); JA278-79 (Ware Aff. ¶¶ 7-15); JA153-214.) The evidence in this proof of quantum not only addressed the direct costs of the work, but also the mark-ups for the indirect costs and profit. (JA245-46 (Muhl Aff. ¶¶ 121-123); JA273-74 (Conkin Aff. ¶ 25); JA278-79 (Ware Aff. ¶¶ 7-15); JA283-88 (Ware Aff. Ex. B-C).) The VA did not reimburse Reliable for any of these costs.

## VII. THE PROCEEDINGS BELOW

On March 14, 2007, Fisk submitted a certified claim to Reliable for damages incurred by Fisk and Fisk's supplier DTE Energy in the amount of $909,606.17, including detailed supporting documentation for the claimed costs in removing the rejected Cummins Generators and procuring the replacement Caterpillar Generators. (JA141-214; JA230 (Muhl Aff. ¶ 8).)

Reliable, in turn, submitted a certified claim to the VA on April 3, 2007, in the amount of $1,100,623.00. (JA138-40; JA273 (Conkin Aff. ¶ 23).) On October 9, 2012, Reliable appealed from the lack of a Contracting Officer's decision on its certified claim. (JA215; JA273.) The Board ordered a Contracting Officer's final decision in its October 15, 2012 Initial Scheduling Order.

On November 20, 2012, the Contracting Officer issued its final decision on Reliable's claim. (JA216-18.) The Contracting Officer denied the claim on four

grounds: (a) DTE Energy allegedly failed to respond to RFI 177 by verifying the Cummins Generators were "unused" and "warrantable," which the Contracting Officer reasoned did not indicate that the units were "new"; (b) the Generators were not "new" because they were "not new, they were previously owned, and required reconditioning…"; (c) the equipment was not new and of the most suitable grade for the purpose intended under the Contract; and finally (d) the Cummins Generators were "previously owned and required reconditioning in order to meet the contract requirements." (JA216-17.)

Reliable then appealed the Contracting Officer's decision to the Civilian Board of Contract Appeals. The parties agreed to submit the case on the record without a hearing pursuant to Board Rule 19. 48 C.F.R. § 6101.19 (2012). On July 12, 2013, Reliable submitted its Brief on the Record and the supporting affidavits of Reliable's Michael Ware (Vice President, Secretary and Treasurer) and Dave Conkin (Vice President and Senior Project Manager), Fisk's James Muhl (Executive Vice President and Chief Operating Officer), and OK Generators' Robert Birdsong (President).

On August 23, 2013, the VA submitted its Reply Brief on the Record, with supporting affidavits from the SRE Leonard James Michael Romano and RE Tomas DeCastro-Quiroz. On August 30, 2013, Reliable submitted its Rebuttal Brief. On November 27, 2013, the Board issued its Decision.

# SUMMARY OF THE ARGUMENT

*First*, the Board erred as a matter of law in determining the Cummins Generators were not "new" under the Contract where the Generators were unused and warrantable.  The Contract's Material and Workmanship Clause requires all equipment "shall be new and of the utmost suitable grade for the purpose intended."  The relevant Federal Acquisition Regulation ("FAR") defines "new" to mean "composed of previously unused components…."  Unchallenged evidence in the record showed that the rejected Generators were never used and were fully warrantable by the manufacturer, thus satisfying the Contract's requirement to provide "new" generators.

*Second*, the Board erred by relying on the "factory-testing" specification to determine whether the Generators were "new."  The "factory-testing" specification is distinct and unrelated from the requirement that the equipment is "new."  Indeed, the VA did not witness factory-testing on the Caterpillar Generators that were accepted as "new."  Further, even if the specification was relevant, there was no evidence to support the Board's finding that the Generators were incapable of being factory tested.

*Third*, the Board erred in failing to find that the VA caused Reliable to undertake economically wasteful conduct.  Reliable was able to resolve any issues with the Cummins Generators for far less cost than replacing them.  Reliable is

entitled to recover the cost it incurred in abiding by the economically wasteful requirements imposed by the VA.

*Fourth*, "unused" equipment is "new" under the Contract and applicable federal regulations. Thus, certifying a unit as "unused" and "fully warrantable" means the unit is "new." Reliable's certification that the Generators were "unused" and "fully warrantable" was equivalent to stating they were "new." The Board should have determined the Cummins Generators were "new," regardless of whether Reliable said the "magic words" in its certification.

And *fifth*, Reliable is entitled to its claimed quantum. The VA failed to challenge below the damages alleged by Reliable in its proof of quantum. This Court should therefore reverse the decision and enter judgment in favor of Reliable and award it the damages alleged in the proof of quantum.

## <u>ARGUMENT</u>

In an appeal from a decision of the Civilian Board of Contract Appeals, this Court reviews issues of law, including issues of contract interpretation, *de novo*. *Rockies Express Pipeline LLC v. Salazar*, 730 F.3d 1330, 1335-36 (Fed. Cir. 2013). The Court reviews the Board's factual findings and application of facts to the law to determine if its findings were arbitrary, capricious, or not supported by substantial evidence. *Id.* at 1335.

## I.    THE BOARD ERRED AS A MATTER OF LAW IN DETERMINING THAT THE CUMMINS GENERATORS WERE NOT "NEW" UNDER THE CONTRACT.

### A.    The Unused Cummins Generators Satisfied the Contract's Requirements.

The Board concluded that the Cummins Generators did not satisfy the Contract's requirement to only deliver "new" equipment.  However, in its findings of fact, the Board also found that the Cummins Generators had all the elements of "new" generators: run times consistent with only factory testing and start-up; statements from Cummins representatives that the Cummins Generators were new; and the Cummins Generators sat unused and uninstalled until they were delivered to the Project.  Based on these findings, the Board erred in failing to conclude the Generators satisfy the Contract's definition for "new."

Under the Contract's Material and Workmanship Clause, found in Part 1.47(a) of Section 01001, the Contract required that "all equipment, material, and articles incorporated into the work covered by this contract shall be *new* and of the utmost suitable grade for the purpose intended, unless otherwise specifically provided in this contract."  (JA079 (emphasis added).)  While this section references FAR 52.236-5 (April 1984)—the former "Material Requirements" clause under the FAR—this regulation does not define "new."  However, Part 1.79(a) of Section 01001 of the Contract expressly incorporates by reference the current Material Requirements clause, 48 C.F.R. § 52.211-5 (August 2000).

(JA098.)  This clause specifically defines "new" to mean "*composed of previously unused components*, whether manufactured from virgin material, recovered material in the form of raw material, or materials and by-products generated from, and reused within, an original manufacturing process; provided that the supplies meet contract requirements, including but not limited to, performance, reliability, and life expectancy."  48 C.F.R. § 52.211-5 (emphasis added).

The Cummins Generators are "new" as this term is defined in FAR 52.211-5.  Indeed, the VA conceded below that the evidence in the record indicates that the Cummins Generators were never used.  (JA293 ("[t]hough the evidence in the record may indicate that the Cummins Generators were never placed into service…").)

This concession is in step with the Board's findings that the Cummins Generators showed run times consistent with only factory start-up and testing:

- Contemporaneous documentation of inspection and tests run by a Cummins representative on the two delivered Generators showed minimal hours on the Generators consistent with factory start-up testing.  (JA004-06; *see also* JA235 (Muhl Aff. ¶ 43); JA272 (Conkin Aff. ¶ 14); JA107-08.)

- Verifications from both DTE Energy and DSA Encore confirming the Cummins Generators had only been run for start-up testing purposes, but were otherwise unused and fully warrantable. (JA006; JA119-20.)

The VA's concession and the Board's findings are also consistent with Reliable's considerable and detailed evidence, through its witness testimony and contemporaneous documentation, that the Cummins Generators were never previously placed into service. Unchallenged testimony summarizing recent investigations into the history of the Cummins Generators by Mr. Muhl and Mr. Birdsong of OK Generators showed that none of the three Generators were previously put into service at the time they were rejected by the VA. (JA234 (Muhl Aff. ¶ 37-41); JA260-61 (Muhl Aff. Ex. C); JA228 (Birdsong Aff. at ¶ 1).)

This testimony is consistent with Reliable's evidence showing the Cummins Generators were unused, had never been put into service, had run times consistent with only factory start-up testing, and were fully warrantable. (JA119; JA113-14; JA107-08; JA234-35 (Muhl Aff. ¶¶ 36-41); JA260-65 (Muhl Aff. Ex. C-E); JA228 (Birdsong Aff. at 1).) Any minor cosmetic issues were easily resolved at no cost to the VA. (JA234-35 (Muhl Aff. ¶¶ 26-30).)

Necessarily, then, the Cummins Generators are "*composed of previously unused components*" consistent with the FAR's definition of "new." The Board

therefore erred in failing to hold that the Cummins Generators were "new" under the terms of the Contract.

**B.     Trade Practice and Custom Confirms the Cummins Generators Were "New" Where They Were Not "Used."**

Even if the terms of the Contract were not clear regarding the definition of "new"—and it is undoubtedly clear that the Contract incorporates the FAR's definition of "new"—then the Court should resolve any ambiguities by looking to industry custom in the electrical contracting industry regarding when such equipment is considered "new" or "used."  *See, e.g.*, *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (noting trade practice and custom "plays an important role in contract interpretation," even for facially unambiguous terms).  In this regard, unchallenged record evidence shows that in the electrical contracting and construction industry, large pieces of equipment like the Cummins Generators are considered "new" until the equipment is "used," and that equipment is not "used" until the equipment is put into service. (JA234; JA236-38 (Muhl Aff. ¶¶ 38, 53-64); JA113-14; JA119; JA136-37.)

This industry standard is also consistent with "use tests" adopted by other courts for determining whether particular pieces of equipment are "new."  *See, e.g.*, *Groban v. S. S. Pegu*, 331 F. Supp. 883, 890 (D.C.N.Y. 1971) (rusted tractor parts are "new" where unused, regardless of how long ago the parts were manufactured); *Ajax Petroleum Prods. Co. v. Blake*, 126 N.E.2d 926 (Ohio Ct. App. 1953) (unused

road building equipment still "new" where unused four years before its sale);

*Mathis Equip. Co. v. Rosson*, 386 S.W.2d 854, 857 (Tex. Civ. App. 1964) (cotton

picking machine is still "new" where unused and kept in storage for months before

sale and delivery).

    The VA here made no factual challenge to the testimony of Mr. Muhl

regarding the industry custom for determining when equipment is considered

"new" or "used."  Neither of the VA's witnesses, both of whom were resident

engineers on the Project, challenged Mr. Muhl's testimony regarding customs in

the electrical contracting and construction industry.  In fact, the VA expressly

conceded this point by stating that "*previous ownership does not necessarily make

an item used . . . .*" (JA294 (emphasis added).)  Therefore, to the extent any

ambiguity remained regarding the meaning of "new" under the Contract, the Board

erred by failing to apply the industry custom and holding that the Cummins

Generators were "new."

      **C.**    **The Factory-Testing Specification Is Irrelevant in Determining
Whether the Generators Are New or Used.**

    The Board erred in two respects with regards to its reliance on the "factory-

testing" specification.  First, it erred in relying on this specification because it is

distinct from the Contract's requirement to provide "new" equipment.  Second, the

Board erred because the facts do not support its conclusion that the Cummins

Generators were incapable of being factory tested.

1.    **The Board Misinterpreted the Relevance of the Factory-Testing Specification in Determining Whether the Cummins Generators Are "New" Under the Contract.**

The Board held that the Generators were not "new" under the Contract's Material and Workmanship Clause based not on the FAR's definition of "new"—which clearly shows the Cummins Generators were in fact "new"—but rather on the Contract's separate "factory-testing" specification. The Board's reliance on this "factory-testing" specification was erroneous for several reasons.

*First*, the Board erroneously conflated the Contract's requirement of "new" equipment under the Material and Workmanship Clause with the "factory-testing" specifications. These are separate contractual terms. Indeed, nothing in the Contract suggests that these terms are interpreted synonymously. By assuming that these terms are one in the same, the Board erroneously interpreted the requirements imposed by the Contract.

*Second*, while the Board placed heavy emphasis on the "at the factory" specification, there is no dispute that the VA *never* actually observed factory testing for *any* piece of electrical equipment delivered to the Project. (JA240 (Muhl Aff. ¶¶ 80-81); JA272 (Conkin Aff. ¶ 18).) Mr. DeCastro-Quiroz provided merely generic testimony that he witnessed "testing" of the replacement Caterpillar Generators, but he did not indicate whether the tests he allegedly witnessed were the load tests or the startup tests relied on by the VA. (JA299.) Additionally, no

evidence suggests that this same testing could not have been observed for the Cummins Generators, which the Board found the VA declined to do. (JA006 ("OK Generators tested the Cummins generators at its facility. While it was invited to do so, the VA did not observe the testing.").)

It is inconceivable that a provision of the Contract that the VA never actually relied upon would provide the relevant definition for "new" and permit the VA to refuse delivery of the Cummins Generators. Indeed, if this were the case, then none of the equipment delivered to the Project was "new" because the VA did not witness factory-testing for any of the equipment. Contract Section 16208, Part 1.3, ¶ E thus cannot be construed to provide the Contract's definition of "new."

Moreover, the VA argued below that because the Contract allows the option of witnessing certain testing "at the factory," Reliable could not reasonably believe it could procure generators with "multiple previous owners." (JA291.) On this reasoning, the VA argued that the Contract term "new" must be construed as consistent with the requirement of witnessing testing "at the factory." Such a rigid interpretation of the Contract did not even survive the VA's own brief, as it later offered the reasonable concession that the "VA does not dispute that contractors 'should be entitled to source new, unused equipment from suppliers other than the manufacturers.'" (JA294 (emphasis added).) The Board therefore erred in utilizing the Contract's "factory-testing" specification in its analysis of whether the

Cummins Generators satisfied the Contract's requirement to provide "new" equipment.

### 2. There is No Evidence to Support the Board's Findings Regarding the Factory-Testing Requirements.

Even if the factory-testing specification was relevant to whether the Generators were "new" under the Contract, there was insufficient evidence to support the Board's findings regarding this requirement.

The government bears the burden to prove that a contractor failed to correct work to conform to a contract's terms. *Appeal of Ben M. White Co.,* ASBCA No. 36643, 90-1 BCA ¶ 22420 ("The burden is upon the Government to establish that the work it sought to have corrected did not conform to the contract in a material respect . . . ."). The VA conceded below that it bore the burden to prove the Cummins Generators failed to comply with the requirements of the Contract. (JA292.)

Despite having this burden, the VA failed to offer any meaningful evidence that the Cummins Generators were incapable of being factory tested. Nor did the VA provide any evidence to rebut Reliable's compelling evidence that the Cummins Generators satisfied the Contract's requirements. Yet, quizzically, the Board concluded that "[c]learly, the Cummins generators, which had been in storage for four years, could not be factory-tested and did not meet the requirement of being 'new.'" (JA008.) Unsurprisingly, the Board cited <u>no evidence</u> to support

this conclusion.  Had the VA requested factory-testing for the Cummins

Generators, it may have been possible to return the units for any such testing.  But

there is no direct evidence in the record either way because the VA rejected the

Generators on its now abandoned theory of "previous ownership equals used."

The VA thus failed to satisfy its burden to show that factory-testing was

impossible.

Moreover, while there is no evidence supporting the Board's finding that the

Generators "could not be factory-tested," uncontroverted evidence in the record

shows the Generators not only <u>could</u> comply with the Contract's factory-testing

specification, but <u>did</u> comply with this specification.  Numerous contemporaneous

documents show that the Generators had run times consistent with "factory start-up

testing."  (JA107-08 (Cummins representative's Generator Status Report indicates

run times consistent with "test and startup condition"); JA113-14 (DTE Energy and

DSA Encore correspondence both confirm units have "only a few test hours on

them").)  The Board completely failed to acknowledge evidence of such testing, or

distinguish why such testing did or did not in fact satisfy the Contract

specifications.  The Board thus erred in concluding that the Generators "could not

be factory-tested."

### 3. The Testing History of the Caterpillar Generators Undermines the Board's Conclusions Regarding Factory-Testing Requirements.

The Board's reliance on the factory-testing specification is further undermined by the VA's acceptance of the Caterpillar Generators, which were provided to the VA after it objected to the Cummins Generators. The Board found "[t]he VA accepted the Caterpillar generators and the certifications that they were 'new,' and we decline appellant's invitation to look behind those certifications to analyze whether the Caterpillar generators had defects similar to the Cummins generators." (JA009.) But there is no evidence in the record that the VA ever considered whether the Caterpillar Generators conformed to the terms of the Contract, despite significant similarities between them and the Cummins Generators.

*First*, Mr. Romano failed to challenge or qualify his unqualified acceptance of the Caterpillar Generators as "new." Reliable showed that the Caterpillar Generators were in all respects "new" and were accepted by the VA as such. The VA has failed to show otherwise.

*Second*, despite the VA's theory that "new" requires all equipment to be bought off the factory floor, the VA cannot dispute that the Caterpillar Generators did not come from the Caterpillar factory floor. These replacement generators were purchased through a series of intermediaries (including ultimately a joint

venture between Pantropic and High Plains). (JA237 (Muhl Aff. ¶61).) The Caterpillar Generators were actually ordered by another party in Tampa, Florida (and had parts stamped "Tampa"), but at the last minute, the Tampa buyer canceled the order. (JA237 (Muhl Aff. ¶¶ 60-61).) The generators were ultimately shipped out to the Project in Miami, with stops in South Dakota and at Pantropic along the way. (JA241 (Muhl Aff. ¶ 90-92).) Despite the complex circumstances of this procurement, Mr. Romano rightfully accepted the Caterpillar Generators as "new" without question or qualification. (JA235.)

*Third*, evidence in the record clearly shows that the Caterpillar Generators did not experience load testing at the Caterpillar factory. (JA134; JA241 (Muhl Aff. ¶¶ 73, 82).) Indeed, undergoing load bank tests offsite is not uncommon. (JA241 (Muhl Aff. ¶ 72) ("[r]egarding the resistive load bank tests, this is in fact a VA requirement and can be performed on units in any number of places. Resistive load bank tests can be performed at the factory, at a local dealer, or even at the job site.").) This testimony was not challenged by the VA.

*Finally*, the VA conceded that one does not have to buy directly from the manufacturer (in the context of the Caterpillar Generators). (JA294.) It nonetheless readily accepted the Caterpillar Generators as "new," without any qualification regarding factory-testing. This is inconsistent with the purported contractual requirement of factory-testing.

The Board refused to even consider the compelling evidence that the Caterpillar Generators were accepted as "new" even though there is no evidence whether or not they had been factory tested. This significantly undermines the Board's conclusion that "new" is based on the ability of equipment to undergo factory-testing.

**D.     Reliable Is Entitled to a Recovery for the VA's Economic Waste.**

Even if the Cummins Generators did not comply with the Contract, the VA was obligated to provide Reliable an opportunity to cure. The VA failed to do so, thereby causing Reliable to undertake an economically wasteful course of performance. This Court should permit Reliable to recover this economic waste, irrespective of whether the Cummins Generators complied with the terms of the Contract.

### 1.     The VA Caused Reliable to Incur Economic Waste.

While Reliable believes that the Cummins Generators complied with the terms of the Contract, even if they did not, the VA was obligated to allow Reliable a reasonable opportunity to cure the breach. The VA's failure to do so caused Reliable unnecessary economic waste.

In the briefings below, the VA relied on *Granite Construction Co. v. United States*, 962 F.2d 998 (Fed. Cir. 1992), the seminal federal case on the doctrine of economic waste, for the proposition that "the government generally has the right to

insist on performance in strict compliance with the specifications and may require a contractor to correct non-conforming work." (JA291.) But the VA ignored an important requirement imposed by *Granite*: to allow Reliable a reasonable opportunity to cure by resolving the minor cosmetic issues at OK Generator.

In *Granite*, the Federal Circuit recognized the doctrine of economic waste in federal government contracts. It held that the government's insistence upon strict compliance with specifications, by requiring a contractor to replace work not strictly in conformance with specifications but otherwise adequate for its intended purposes, constituted "economic waste" and entitled the contractor to recover costs incurred in complying with the government's wrongful demand. 962 F.2d at 1008. Specifically, the Federal Circuit stated that:

> The Corps *made no effort to evaluate the quality* of the waterstop in relation to the needs of the Aberdeen project. Had it done so, *the record shows that the Corps would have discovered* that the waterstop was *entirely adequate for the project and that its replacement was unnecessary*. Rather than allowing the STG waterstop to remain in place, *the Corps required [the contractor] to engage in an economically wasteful course of performance*. Under the circumstances, the only reasonable remedy available to the Government was a downward adjustment in the contract price. Therefore, *the directive to remove and replace the waterstop constituted a constructive change under the Changes clause of the contract …*

*Id*. (emphasis added). Accordingly, the Federal Circuit concluded the contractor was entitled to an equitable adjustment "for the cost of removing and replacing the STG waterstop." *Id*.

Here, the VA never provided Reliable a notice to cure, much less an opportunity to cure. Instead, the VA summarily rejected the Cummins Generators out of hand under its (now abandoned) theory of "previous ownership makes them used."

Similar to the government in *Granite*, the VA "made no effort to evaluate the quality of" the Cummins Generators. The VA does not dispute that it not only merely visually inspected two of the three Cummins Generators before rejecting them, but that it also rejected the third Generator sight unseen. (JA240 (Muhl Aff. ¶¶ 86-87).) The VA also does not dispute that Fisk immediately engaged a Cummins representative to provide a Generator Status Report on the two delivered Generators (JA107; JA235 (Muhl Aff. ¶¶ 42-43); JA272 (Conkin Aff. ¶ 14)), which showed that despite their appearances, those Generators were new generators with run times consistent only with testing and start up, and had not previously been put into service (JA235-36 (Muhl Aff. ¶¶ 44-48); JA113-14.) Finally, the VA does not dispute that it refused the opportunity to witness the inspection and testing of the Cummins Generators at OK Generators before Mr. Romano summarily rejected them on his (now abandoned) theory that "previous ownership makes them used." (JA119-20; JA236, JA240 (Muhl Aff. ¶¶ 51, 79); JA272 (Conkin Aff. ¶ 16).)

Moreover, similar to *Granite*, the record shows that had the VA attended the inspection and tests at OK Generators, it would have discovered that the Cummins Generators were entirely adequate for the Project and that replacement was unnecessary. The VA would also have discovered that these cosmetic issues were easily resolved at no cost to the VA and at a cost far less than the dramatic costs of replacing the Cummins Generators. (JA232-33; JA239 (Muhl Aff. ¶¶ 24-29, 71, 74); *see also* JA252-59 (Muhl Ex. B).) The VA did not rebut this testimony. Pursuant to *Granite*, the VA's conduct caused Reliable to engage in an economically wasteful course of performance.

### 2. Reliable Is Entitled to a Recovery for Its Economic Waste.

The VA required Reliable to engage in an economically wasteful course of performance. Reliable is entitled to recover for this waste where, as here, the government did not provide the contractor "a reasonable time to correct the deficiencies." *Appeal of Ite, Inc.*, NASA BCA No. 1086-6, 88-1 BCA ¶ 20269 ("Under the doctrine of substantial compliance, a contractor is *entitled to a reasonable period in which to cure a nonconformity provided that the goods are delivered in substantial conformity with the contract specifications*.") (pincite unavailable) (emphasis added). This is particularly true where, as here, "the defects complained of are minor in nature and extent and are susceptible to correction within a reasonable time." *Id.* (pincite unavailable); *see also Appeal of*

*Whitesell-Green, Inc.*, ASBCA No. 24395, 80-1 BCA ¶ 14430; *Appeal of G.L.
Cory, Inc.*, No. 22811, 79-2 BCA ¶ 13909.

*Whitesell-Green* involved a pass-through claim for a mechanical
subcontractor.  Four water coils were damaged by freezing when a boiler ceased
functioning in freezing weather.  The subcontractor argued it could simply repair
the damaged coils.  The government argued that the subcontractor had to tear out
and totally replace the damaged coils at a significantly higher cost pursuant to the
"Permits and Responsibilities Clause."  Relying on an earlier decision in *G.L.
Cory*, the Board reasoned:

> The basic question presented by this appeal is the extent to which an
> owner must accept proposals to repair damaged material as an
> alternative to requiring replacement with undamaged new materials.
> In our view the Permits and Responsibilities clause imposes upon a
> contractor a duty to repair damaged material to make it as good as
> new and if this cannot be done, to replace the material. It follows that,
> while an owner deserves an end product which fully conforms to
> plans and specifications and is as good as new, *he cannot require
> more by way of repair or replacement than is reasonably necessary to
> achieve this standard without becoming subject to a claim for an
> equitable adjustment under the Changes clause*.

*Id.* (emphasis added) (internal citations omitted).  Since repair of the damaged coils
would have restored them to a new condition, the government's direction to
replace the coils was a change over and above that required by the contract.  *Id.*

Similar to the reasoning of the Board in *Whitesell-Green* and *G.L. Cory*, any
issues with the Cummins Generators were easily resolved at OK Generators.  Not

only was the cost to fix the Generators substantially less than completely replacing those Generators, the VA would not have incurred any charges for this work. Reliable was forced instead to bear substantially higher costs than required under the Contract based on this economically wasteful conduct. Therefore, the VA should reimburse Reliable for its economic waste.

### E. The Board Erred, As a Matter of Law, By Concluding Reliable Failed to Comply with Whatever Certification Requirements the Contract Imposed Upon It.

The VA abandoned its sole contemporaneous justification for rejecting the Cummins Generators: "previous ownership makes them used." However, the VA then conceded in its briefing below that previous ownership *does not* make a generator used and that a contractor is entitled to procure equipment from a source other than the manufacturer. (JA294.) The VA has since adopted what can only be characterized as its "magic words" defense: that the rejection was based on Reliable's failure to use the magic word "new." The Board erred in accepting this after-the-fact justification for several reasons.

*First*, the Board erred in accepting an after-the-fact justification when the VA abandoned its original justification for rejecting the Generators. Contrary to the strident position taken by the Contracting Officer in his July 15, 2004 rejection letter that "previous ownership makes them used," the VA has conceded that previous ownership *does not* make a unit used and that a Contractor is entitled to

procure equipment from a source other than the manufacturer.  (JA294.)

Accordingly, the VA necessarily must concede that no *per se* legal issue precluded

Fisk from purchasing the Cummins Generators from DSA Encore.  However, the

only reason Mr. Romano gave for rejecting the Generators was prior ownership:

> Previously owned equipment is not new and as noted in DTE's letter,
> DSA Encore had previously owned the generators being offered.
> *Previous ownership makes them used*.

(JA122 (emphasis added).)  The Contracting Officer since reiterated this position

in the Contracting Officer's final decision.  (JA216-18.)

But Mr. Romano failed to endorse (or even mention) this theory of rejection

in his declaration.  Instead, Mr. Romano insists the rejection was based on

Reliable's failure to use the magic word "new," stating:

> Based on the results of my visual inspection, I issued a Request for
> Information ("RFI") No. 177 asking that the contractor certify the
> generators as "new."  (R4, Tab 6).  The only certification I ever
> received in response to the RFI was that the units were "unused and
> warrantable," rather than "new" as I had requested.  (R4, Tab 11, at
> 4).

(JA297 (Romano Dec. ¶ 5).)

Mr. Romano fails to mention, much less endorse his "previous ownership"

theory.  The VA conceded the point by expressly admitting "*previous ownership

does not necessarily make an item used . . . .*"  (JA294.)  Taken together, the VA

abandoned its theory that "previous ownership makes them used."

The Board nonetheless accepted the after-the-fact "magic words" defense advanced by the VA and Mr. Romano.  Despite ample evidence that the Cummins Generators were *unused* (having never been placed into service) and *fully warrantable*, the Board reasoned the Cummins Generators were properly rejected because Reliable didn't say the magic word—"new"—in its certifications.  The Board erred in accepting this theory, as it defies common sense, industry custom and finds no support in the record.

*Second*, the Board erred as a matter of law by concluding that a certification that the Generators were "unused and warrantable" is not the equivalent of a certification that the Generators were "new."  Here, there was no Contract or statutory requirement for Reliable to certify the equipment as "new" using only the word "new."  Reliable certified that the Generators were "unused" and "fully warrantable," which is the equivalent of "new" as the FAR defines that term.

There is simply no statute or regulation that imposes such a strict requirement on the contractor.  Consider, for example, a CDA certification. Boards and courts have held that under the CDA certification standard, a contractor must only show substantial compliance.  *See Alcan Elec. & Eng'g Co., Inc. v. United States*, 24 Cl. Ct. 704, 707 (1992) (The substantial compliance standard of review dictates that "exact duplication of the statutory language is not required" and the contractor need "not recite verbatim each operative word of the statute.");

-35-

*Metric Constructors, Inc.*, ASBCA No. 50843, 98-2 BCA ¶ 30,088 (established CDA principles hold that substantial compliance is the standard to meet the CDA certification requirements).

In an analogous situation, this Court addressed whether the omission of the phrase "government is liable" from a contractor's CDA certification was sufficient to meet the CDA certification requirements. *United States v. Gen. Elec. Corp.*, 727 F.2d 1567, 1569 (Fed. Cir. 1984). This Court rejected as "meritless" the argument that the contractor's omission of the words "government is liable" from a CDA certification resulted in the failure to meet the statutory certification requirements. *Id*.

Through its holding, the Board has effectively imposed a stricter requirement on Reliable to comply with the Material and Workmanship Clause than is required to certify a claim to the government, even where the Contract is silent on this issue. Nothing in the record supports the finding that "unused" and "fully warrantable" is insufficient to satisfy a certification that the Generators were "new."

The Board therefore erred, as a matter of law, both in interpreting the Contract so as to require the contractor to certify the Generators as "new" and in determining that Reliable failed to do so. By certifying that the Cummins

Generators were "unused" and "fully warrantable," Reliable complied with any

contractual certification requirements.

### F. Reliable Is Entitled to Its Claimed Quantum Where the VA Failed to Challenge its Damages Below.

Reliable's proof of quantum was detailed, extensive, and uncontested.

(JA220-27; JA241-46 (Muhl. Aff. ¶¶ 94-123); JA273-74 (Conkin Aff. ¶¶ 19-25);

JA278-79 (Ware Aff. ¶¶ 7-15); JA153-214).)  The evidence not only addressed the

direct costs of the work, but the mark-ups for the indirect costs and profit.  (JA245-

46 (Muhl Aff. ¶¶ 121-123); JA273-74 (Conkin Aff. ¶ 25); JA278-79 (Ware Aff. ¶¶

7-15); JA283-88 (Ware Aff. Ex. B-C).)  Reliable met its *prima facie* evidentiary

burden to show its damages.  *Appeal of Reliable Contracting Group, LLC*, CBCA

1539, 11-2 BCA ¶ 34882, *citing Lisbon Contractors, Inc. v. United States*, 828

F.2d 759, 767 (Fed. Cir. 1987) ("The party seeking the recovery of incurred costs

has 'the burden of proving the amount . . . with sufficient certainty so that the

determination of the amount . . . will be more than mere speculation.'").  The

burden then shifted to the VA to rebut Reliable's evidence.  *Id.*

The VA failed to carry its burden as it did not introduce <u>any</u> evidence that

would undermine the proof of quantum.  Accordingly, all of Reliable's damages

should be awarded if entitlement is found.  Reliable is entitled to all costs it

expended in removing the Cummins Generators and procuring and installing the

replacement Caterpillar Generators, plus the mark-ups it has proven for overhead

and profit.  The Court should reverse the decision and enter judgment in the amount of $1,138,662.95, plus CDA interest from April 3, 2007.

## **CONCLUSION**

For these reasons, Reliable respectfully requests that the Court reverse the Board's decision denying Reliable's claim for entitlement, and render judgment confirming entitlement and awarding all quantum in the amount of $1,138,662.95, plus CDA interest from April 3, 2007, where the VA failed to challenge any of Reliable's damages.

Dated:        June 5, 2014

Respectfully submitted,

KILPATRICK TOWNSEND &
STOCKTON LLP

By: /s/   Reginald A. Williamson
William E. Dorris
Reginald A. Williamson
KILPATRICK TOWNSEND &
    STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4530
Telephone:  (404) 815-6500

Richard D. Dietz
Thurston H. Webb
KILPATRICK TOWNSEND &
    STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC  27101
(336) 607-7300

ATTORNEYS FOR APPELLANT
RELIABLE CONTRACTING GROUP
LLC



**UNITED STATES**
**CIVILIAN BOARD OF CONTRACT APPEALS**

DENIED: November 27, 2013

CBCA 3048

RELIABLE CONTRACTING GROUP, LLC,

Appellant,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

Reginald A. Williamson and William E. Dorris of Kilpatrick Townsend & Stockton LLP, Atlanta, GA; and Gregory C. Thomas, General Counsel of Fisk Electric Company, Houston, TX, counsel for Appellant.

Ogochukwu Ekwuabu, Charlma Quarles, and Phillipa L. Anderson, Office of General Counsel, Department of Veterans Affairs, Washington, DC, counsel for Respondent.

Before Board Judges **DANIELS** (Chairman), **BORWICK**, and **SHERIDAN**.

**SHERIDAN**, Board Judge.

This is a claim brought by Reliable Contracting Group, LLC (Reliable), the prime contractor, on behalf of itself and its first tier subcontractor, Fisk Electric Company (Fisk), and Fisk's electrical supplier, DTE Energy Technologies, Inc. (DTE Energy). Reliable was contracted to design and construct a new utility plant and electrical distribution system at the Department of Veterans Affairs (VA) Medical Center (VAMC) in Miami, Florida. Reliable seeks an equitable adjustment in the amount of $1,138,662.95 for what it characterizes as a VA-directed change to remove and replace certain back-up generators at the VAMC. The parties have elected to submit the case on the record without a hearing pursuant to Board Rule 19. 48 CFR 6101.19 (2012).

11/27/2013 15:49 FAX @003/010

## Findings of Fact

This case arose out of a contract issued by the VA for the design and construction of a new utility plant and electrical distribution system at the VAMC in Miami, Florida. One of the primary purposes of the project was to upgrade and consolidate the electrical equipment at the VAMC. On February 10, 2003, the VA awarded contract V101BC0197 to Echo Construction Company (Echo), for a total contract amount of $ 20,345,000. By way of a March 31, 2003, novation agreement, Echo, Reliable, and the VA agreed to transfer all rights, titles, and interest in the contract to Reliable.

The contract required the furnishing and installation of two emergency generation systems, one to handle essential loads and another to handle back-up equipment and normal loads. This appeal involves the emergency generators for the back-up system. For the back-up generation system, three back-up emergency generators rated at no less than 1825 kilowatt (kW) prime were required under the contract. Reliable subcontracted with Fisk to provide the back-up generators, and Fisk utilized DTE Energy to supply the generators. DTE Energy offered Fisk three model DQKC, 1825 kW emergency generators manufactured by Cummins Power Generation for installation on the project: serial numbers F000116718, F000116717, and E000107713.

One of the Cummins generators was delivered to the project and set in place on June 26, 2004, and another on June 27.[1] The generators were inspected by the VA upon delivery, where it was noticed by the VA's senior resident engineer (SRE), Leonard Romano, that the generators showed "a lot of wear and tear including field burns to enlarge mounting holes." On June 27 SRE Romano forwarded a request for information (RFI) to Reliable, stating:

> I am concerned that [the two generators that were delivered] are not "new" as required by General Conditions 01001, 1.47(a). They show a lot of wear and tear including field burns to enlarge mounting holes. Are they new and will you certify them as such? I cannot pay you for these as planned in this month's payment without that certification.

Contract section 01001, GENERAL CONDITIONS, provides in pertinent part at paragraph 1.47(a): "All equipment, material, and articles incorporated into the work covered

---

[1] These two generators were shipped from New York; the third generator was in Virginia. It appears that the generator in Virginia was never shipped to the VA project.

11/27/2013 15:49 FAX                                                    @004/010

by this contract shall be new and of the most suitable grade for the purpose intended." Contract section 16208, ENGINE GENERATORS, provides:

> ### 1.3   QUALITY ASSURANCE
>
>   . . . .
>
> > E.   Factory Test:  The Government shall have the option of witnessing the following tests at the factory. . . .
> > 1. Load Test . . . .
> > 2. Quick Start Test . . . .

Fisk wrote DTE Energy on June 28, 2004, about the "serious concerns" that Reliable and the VA had about the two Cummins generators that were delivered to the project site. Fisk noted:

> My foreman noted that the units were in "BAD CONDITION" and proceeded to install them.
>
>   . . . .
>
> [Reliable] and the VA have indicated to Fisk Electric, that the two units appear to be used and have given directive (see attached) for Fisk to remove them from the site until proven otherwise.  Our purchase order indicates new generators are to be installed, please provide written documentation to that effect.

Reliable's June 28, 2004, directive to Fisk stated:

> As you are aware [the VA] has very serious doubts and concerns as to whether the equipment furnished is in compliance with the contract.  As is apparent from the photographs previously sent you the units were manufactured four years ago and from markings and wear on the units themselves, there are concerns that the units have been previously installed and used.  The [VA] had made it clear that **these units will be rejected** if they are not in 100% compliance with the contract documents **in every respect**.
>
> [T]his is a very serious matter which reflects poorly on Fisk and has adverse implication for Reliable's relationship with [the VA] and has monumental impact to the schedule of this project.  We simply cannot allow this equipment

11/27/2013 15:50 FAX                                                                    ☒005/010

to remain on site without immediate and conclusive proof that they are in 100% compliance with the contract documents and hereby are notifying Fisk to remove the generators at once from the project site.

To compound the problem, the steel erector is fully mobilized (with a crane) and prepared to begin erection this week. We have no alternative but to hold Fisk responsible for any delays and/or damages arising out of this matter, including but not limited to the interruption to the progress of the work and all costs associated with the immediate removal of the non-compliant equipment.

DTE Energy had purchased the Cummins generators from DSA Encore, which wrote to DTE Energy on June 28, explaining that:

These [Cummins] generators had been sold to another company who took delivery of the units, but never installed or started the units. They sat in place, uninstalled/unused, until DSA Encore picked up the units and delivered them to Galasso Riggers where they remained until now.

Upon delivering the generators to Galasso Riggers, DSA Encore hired Cummins Power to perform preventative maintenance and start the units, prior to preparing them for storage.

The generators have only a few test hours on them, and come with a full 1-year warranty.

While there is evidence in the record that this letter was emailed to Fisk, it is unclear from the record that Reliable or the VA received this email or the information contained in the letter.

On June 29, 2004, SRE Romano again wrote to Reliable, informing it that the Government would not accept used equipment and asking for an explanation about the generators:

To avoid any confusion or additional delay on your part . . . be advised that the Government will not accept used equipment. . . . Only two of the three [generators] ever showed up and they are not only used but also abused. It is inconceivable to me that you would have ever considered pulling off such a deception on the Government. I strongly advise for the sake of your company's reputation that you immediately provide a full explanation of the

11/27/2013 15:50 FAX                                                              006/010

above complete with your time to salvage the timely completion of this contract.

Reliable again wrote to Fisk on June 29, 2004, advising that Reliable was taking the matter very seriously and "as we discussed with you, the equipment on site is clearly unacceptable by anyone's standards." Reliable urged Fisk to have conforming equipment delivered to the project as soon as possible due to the "critical nature of [the generators] to the schedule and overall success of the project," and asked that Fisk "immediately coordinate with our field staff the removal of the unacceptable equipment from the site at the earliest possible opportunity."

Reliable also wrote to SRE Romano on June 29, saying it was in contact with Fisk, which had assured that "they were as surprised as anyone at the condition of the equipment delivered to the site." Reliable informed the VA that it had "directed [Fisk] to remove the nonconforming generators from the project site." The June 29 correspondence between Reliable and Fisk, as well as Reliable and the VA, stresses the importance of the contract's schedule, the impact the unacceptable generators were having on the schedule, and the importance attached to resolving the generator issue.

Fisk wrote to Reliable on June 29, 2004, saying that Fisk had requested the run hour status of the two generators delivered to the project and had a representative from Cummins physically view the generators and witness the history of them from the control panel. According to the estimation of the Cummins representative, the units were in "good condition and [the representative] acknowledges that he had received information that they are new generators from Cummins." The two generators' control panels showed, respectively, start hours (7 and 12), engine hours (3 and 2), control hours (9 and 4) and kilowatt hours (2071 and 2251). Fisk concluded to Reliable that "[t]he readings indicate that the generators appear to only have been in test and start up condition. At this time we are waiting for the documentation from the manufacturers indicating a complete history and a definitive plan of action from DTE to remedy the condition of the generators in place." Fisk wrote Reliable on June 30, 2004, that a Cummins representative had accessed the generator control panels via a laptop computer and "the control panel readings indicated both generators had only factory startup and test run times." Fisk concluded: "In that the generators appear to have been inadequately stored, we have directed DTE Energy to provide us with their plan of action for removing the generators from the project and for providing the generators in compliance to the purchase order." Fisk told Reliable it was "searching the market place for other units in the event this issue cannot be resolved with DTE Energy."

11/27/2013 15:51 FAX 007/010

Around July 1, 2004, Reliable told Fisk to have the Cummins generators removed from the VA project. They were removed that day and shipped to OK Generators, which had factory certified technicians capable of testing and servicing the Cummins generators.

OK Generators tested the Cummins generators at its facility. While it was invited to do so, the VA did not observe the testing. DTE Energy provided Fisk with a proposal around July 8, 2004, to address the generator issue. The proposal was set forth in a letter from DTE Energy to Fisk stating it had verified that the two Cummins generators in issue "are unused and warrantable":

> These units are fully backed by the standard DTE Energy Technologies warranty and the underlying Cummins . . . 1 year warranty for new engines. Prior to our purchase of these units, they were purchased by DSA Encore and placed in enclosures but never run. In accordance with your request, a representative from the local Cummins authorized service group went to the job site, powered the units, and took readings of the run hours on two of the three units; they were 2 hours and 3 hours. The third unit has been powered and shows 3 hours of run time. These run times represent factory test time and pre-startup activities and are typical of new units.

DTE Energy went on to propose that the Cummins generators be tested and evaluated, adjusted as necessary, and "pre-conditioned"; and that the generators be returned to the site on July 19, 2004.[2] Fisk forwarded the DTE Energy proposal to Reliable on July 9, which emailed it to SRE Romano on that same date.[3]

SRE Romano responded to Reliable on July 15, 2004, by quoting the contract's General Conditions provision 01001, 1.47(a) and stating: "[p]reviously owned equipment is not new and as noted in DTE's letter, DSA Encore had previously owned the generators being offered. Previous ownership makes them used." The SRE went on to state that "only new generators with all the submittal data called for in 16208, 1.4[,] reviewed and approved by the Prime Contractor and [VA] Engineer of Record[,] will be considered," and "[t]he new

---

[2] The pre-conditioning activities for the generators included: evaluation; cleaning, removing rust, and painting the exterior surfaces; changing the oil and filters; replacing the coolant; and cleaning, removing rust, and painting the mufflers.

[3] In forwarding the proposal, Reliable noted that SRE Romano was on leave from the project and would not return until July 15, 2004.

11/27/2013 15:51 FAX                                                               008/010

generators are to be factory tested and the government selects the option of witnessing this test."

On July 16, 2004, Fisk directed DTE Energy "to proceed with supplying submittals and generators as per our purchase order, specifications and contract documents." According to Reliable, DTE Energy wrote Fisk on July 21, 2004, to address the SRE's concerns about the generators, but SRE Romano attests that he has no recollection of receiving a copy of that letter prior to receiving Reliable's claim. The record shows that, internally, Fisk's purchasing agent objected to SRE Romano's conclusion that "previous ownership of [the Cummins generators] makes them used," and urged Fisk management to take exception to the SRE's conclusion. However, the record does not contain documentary evidence that Fisk contacted Reliable or that Reliable contacted the VA to take exception to the SRE's conclusion.

At Reliable's urging, Fisk started to look at supplying the VA project with three Caterpillar 3516, 2000 kW generators for the emergency generation system. Fisk used Pantropic Power, Inc. and High Plains Power Systems, Inc. to supply the Caterpillar generators. Reliable's submittal on the Caterpillar generators was approved on October 13, 2004. On April 19, 2005, Reliable provided to SRE Romano certifications from Pantropic and High Plains that the Caterpillar generators were "new."

On April 3, 2007, Reliable submitted to the VA a certified claim in the amount of $1,100,623 on behalf of Fisk "for the additional costs incurred due to the VA issued directive to replace the [Cummins] 1825 kW emergency generators."[4] When the VA contracting officer failed to issue a timely final decision, Reliable appealed the deemed denial of the claim to this Board, where it was docketed as CBCA 3048. On November 20, 2012, the contracting officer (CO), Ed Nicholson, issued a contracting officer's final decision denying the claim. CO Nicholson recounted some of the facts leading up to the issue and noted that the VA SRE had asked Reliable to certify the generators were "new" and it failed to do so, instead verifying that the generators were "unused" and "warrantable." CO Nicholson wrote that "unused" and "warrantable" do not indicate that the units are "new"; he concluded that the generators were "previously owned" and "reconditioned," as defined by Federal Acquisition Regulation (FAR) 52.211-5(a), in that they had to be "restored to the original normal operating condition."[5] Additionally, the contracting disagreed that the Cummins

---

[4]      The claim was subsequently adjusted to $1,138,662.95.

[5]      The clause found at FAR 52.211-5 MATERIAL REQUIREMENTS, for use in solicitations and contracts for supplies that are not commercial items, provides, among other things, definitions for the terms "new" and "reconditioned." "*New* means composed of previously unused components, whether manufactured from virgin material, recovered

11/27/2013 15:52 FAX 009/010

generators were "of the most suitable grade for the purpose intended under the contract," particularly as "Fisk was as surprised as anyone at the condition of the equipment delivered to the site," and had originally concluded that "the equipment on site is clearly unacceptable by anyone's standards." CO Nicholson concluded the Cummins generators were "previously owned" by DSA Encore and "required reconditioning in order to meet the contract requirements."

Discussion

The dispute before us involves a question of contract interpretation and whether the Cummins generators that Reliable offered to the VA were new and otherwise met the terms of the contract. To resolve this issue of interpretation, we look first to the plain language of the contract. *See Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993). The intention of the parties is gleaned from the contract's clauses interpreted as a whole, giving meaning to all provisions wherever possible. An interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void insignificant, meaningless or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible. *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965). We need not go beyond the four corners of this contract to decide the merits of the dispute before us. *Id.* at 976.

General Conditions provision 01001, 1.47(a) of the contract required Reliable to provide that equipment was "new and of the most suitable grade for the purpose intended." The contract provision specifically addressing the generators, section 16208, 1.3.E, also required that the testing of the generators occur at the factory with the VA having the option of witnessing the tests. Reading the contract as a whole, to be considered new, each of the generators had to be capable of being tested at the factory. We believe that Reliable understood this, and that is why, when the generator issue arose, it did not overly involve itself in attempting to convince the VA that the generators were "new." Clearly, the Cummins generators, which had been in storage for four years, could not be factory-tested and did not meet the requirement of being "new." Further, it appears that at the time when the Cummins generators issue arose and was being addressed by the VA, neither Reliable nor Fisk characterized the Cummins generators as "new." Conversely, when the Caterpillar

---

material in the form of raw material, or materials and by products generated from, and reused within, an original manufacturing process; provided that the supplies meet contract requirements, including but not limited to, performance, reliability, and life expectancy." 48 CFR 52.211-5(a). "*Reconditioned* means restored to the original normal operating condition by readjustments and material replacement." *Id.* This clause was not included in the contract before us.

generators were offered, Reliable and Fisk readily verified that the generators were "new," and appropriate certifications were forwarded to the VA. The VA accepted the Caterpillar generators and the certifications that they were "new," and we decline appellant's invitation to look behind those certifications to analyze whether the Caterpillar generators had defects similar to the Cummins generators.

Decision

For the reasons set forth above, the Board **DENIES** the appeal.

PATRICIA J. SHERIDAN
Board Judge

We concur:

STEPHEN M. DANIELS
Board Judge

ANTHONY S. BORWICK
Board Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of June, 2014, the foregoing

**CORRECTED BRIEF OF APPELLANT** was filed with the Clerk of Court

using the CM/ECF System.  Counsel for all parties are registered CM/ECF users

and will be served with the foregoing document by the Court's CM/ECF System.

<u>/s/ Reginald A. Williamson</u>

Reginald A. Williamson

KILPATRICK TOWNSEND &
    STOCKTON LLP

1100 Peachtree Street, Suite 2800

Atlanta, GA 30309-4530

(404) 815-6500

*Counsel for Appellant*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(iii) because the brief contains 8,305 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using MS Word 2010 in Times New Roman 14-point font.

/s/  Reginald A. Williamson
Reginald A. Williamson